UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                              :

MENTAL HYGIENE LEGAL SERVICE and   :
SHAWN SHORT,                              :
                                              :

                Plaintiffs,      :
                                              :         07 Civ. 2935 (GEL)

        -v.-                  :
                                              :       **OPINION AND ORDER**

ELLIOT SPITZER, ANDREW CUOMO,    :
MICHAEL HOGAN, DIANA JONES RITTER,  :
and BRIAN FISCHER,              :
                                              :

                Defendants.     :
                                              :
-------------------------------------------------------------x

Sadie Zea Ishee, New York, New York, and Dennis
Bruce Feld, Mineola, New York, for plaintiff Mental
Hygiene Legal Service.

Hollie S. Levine, Binghamton, New York, for
plaintiff Shawn Short.

Edward J. Curtis, Jr., and Bruce B. McHale,
Assistant Attorneys General, New York, New York,
for defendants.


GERARD E. LYNCH, District Judge:

      On March 14, 2007, Governor Spitzer signed the Sex Offender Management and

Treatment Act, which became effective on April 13, 2007, in part as Article 10 of the New York

Mental Hygiene Law ("MHL"), creating a new legal regime for "Sex Offenders Requiring Civil

Commitment or Supervision." As part of the Act, the New York Legislature found that

"recidivistic sex offenders pose a danger to society that should be addressed through

comprehensive programs of treatment and management," MHL § 10.01(a), and that some "sex

offenders have mental abnormalities that predispose them to engage in repeated sex offenses,"

MHL § 10.01(b).  The Legislature concluded that such offenders

> should receive . . . treatment while they are incarcerated as a result
> of the criminal process, and should continue to receive treatment
> when that incarceration comes to an end.  In extreme cases,
> confinement of the most dangerous offenders will need to be
> extended by civil process in order to provide them such treatment
> and to protect the public from their recidivist conduct.

Id.

On April 12, 2007, Plaintiff Mental Hygiene Legal Service ("MHLS") filed a declaratory

judgment action attacking the constitutionality of certain provisions of the Act, and subsequently

moved for preliminary injunctive relief and a temporary restraining order.  Subsequently, Shawn

Short, an individual subject to various provisions of the law, intervened in the matter and joined

MHLS's motions.  Plaintiffs do not attack the substantive constitutionality of the statutory

provision for civil commitment.  Rather, their motion focuses narrowly on particular procedural

provisions of the Act, contending that specific aspects of the regime it creates fail to provide the

requisite procedural safeguards necessary to comport with the constitutional command that

persons may not be deprived of liberty without due process of law.  Plaintiffs also contend that

certain aspects of the statutory regime deny the individuals subject to those provisions the equal

protection of laws guaranteed by the Constitution.   Together, the plaintiffs challenge:

    (A)    MHL § 10.06(f), which authorizes the New York Attorney General to issue a
"securing petition" to detain certain individuals beyond the completion of their
term of imprisonment, in advance of the probable cause hearing, without notice or
opportunity for review;

    (B)    MHL § 10.06(k), which mandates involuntary civil detention pending the
commitment trial, based on a finding at the probable cause hearing that the
individual may have a mental abnormality, without a finding of current
dangerousness;

(C)     MHL § 10.06(j)(iii), which forbids an individual indicted for a crime but found incompetent to stand trial to contest the commission of the acts that constituted the crime at the probable cause hearing;

(D)     MHL § 10.07(d), which authorizes civil commitment for persons found incompetent to stand trial and never convicted of any offense based on a showing by clear and convincing evidence that they committed the sexual offense with which they were charged;

(E)     MHL § 10.07(c), which authorizes the factfinder at the commitment trial to make a retroactive determination by clear and convincing evidence that certain non-sex crimes were committed with a "sexual[] motivat[ion];"

(F)     MHL § 10.05(e), which authorizes certain pre-hearing psychiatric examinations, in the absence of counsel, of individuals subject to the Act.[1]

Oral argument was heard on September 14, 2007.

For the reasons discussed below, plaintiffs have demonstrated irreparable injury as well as a likelihood of success in demonstrating that § 10.06(k) is unconstitutional insofar as it permits civil detention pending trial without an individualized finding of current dangerousness and that § 10.07(d) is unconstitutional insofar as it allows detention of individuals after the commitment trial absent a finding beyond a reasonable doubt that such individuals committed the acts which constituted the crime for which they had been charged. Defendants' motion to dismiss these portions of plaintiffs' complaint will therefore be denied. Plaintiffs have failed to make a showing sufficient for a preliminary injunction against the restrictions on contesting certain past events at the probable cause hearing as provided for in § 10.06(j)(iii). Defendants' motion to dismiss that portion of plaintiffs' facial attack against this provision will be granted.

---

[1] At oral argument, plaintiffs withdrew their application for preliminary injunctive relief with respect to a seventh provision, MHL § 33.13(c)(9)(vii), which permits the release of confidential clinical and medical records of certain individuals subject to the act under certain specified circumstances.  (Tr. 5).

Both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss regarding challenges to the securing petition procedures, as provided for in § 10.06(f), the retroactive determination of the "sexual motivation" of a past crime, as provided for in § 10.07(c), and the failure to appoint counsel in advance of certain pre-hearing psychiatric exams, as provided for in § 10.05(e), will be denied.

## DISCUSSION

I.     Article Ten of the MHL

Provisions of the Act are triggered when a "person who may be a detained sex offender is nearing an anticipated release" from confinement or parole.  MHL § 10.05(b).[2]  A "[d]etained sex offender" is (for the most part) a person "in the care, custody, control, or supervision of an agency with jurisdiction," as a result of having been adjudicated to have committed certain sex offenses or certain designated felonies with a "sexual[] motivat[ion]."  MHL § 10.03(g).[3]  As

---

[2] "Release" is defined to include "release, conditional release or discharge from confinement, from supervision by the division of parole, or from an order of observation, commitment, recommitment or retention."  MHL § 10.03(m).

[3] The complete definition of "detained sex offender" is:

> a person who is in the care, custody, control, or supervision of an agency with jurisdiction, with respect to a sex offense or designated felony, in that the person is either: (1) A person who stands convicted of a sex offense as defined in subdivision (p) of this section, and is currently serving a sentence for, or subject to supervision by the division of parole, whether on parole or on post-release supervision, for such offense or for a related offense; (2) A person charged with a sex offense who has been determined to be an incapacitated person with respect to that offense and has been committed pursuant to article seven hundred thirty of the criminal procedure law, but did engage in the conduct constituting such offense; (3) A person charged with a sex offense who has been found not responsible by reason of mental disease or defect

4

such a person nears release, a case review team ("CRT") of three individuals, at least two of whom must be mental health professionals meeting certain statutory requirements, MHL § 10.05(a), are to determine whether the person is a "sex offender requiring civil management." MHL § 10.06(a).

As defined by the Act, a "[s]ex offender requiring civil management" is a "detained sex offender who suffers from a mental abnormality," who is either "a dangerous sex offender requiring confinement" or "a sex offender requiring strict and intensive supervision." MHL § 10.03(q). A "[d]angerous sex offender requiring confinement" is a "detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL § 10.03(e). A "[s]ex offender[] requiring strict and intensive supervision" is a "detained sex offender who suffers from a mental abnormality but is not a dangerous sex offender requiring confinement." MHL § 10.03(r). A mental abnormality is defined to be a "congenital or acquired

---

for the commission of that offense; (4) A person who stands convicted of a designated felony that was sexually motivated and committed prior to the effective date of this article; (5) A person convicted of a sex offense who is, or was at any time after September first, two thousand five, a patient in a hospital operated by the office of mental health, and who was admitted directly to such facility pursuant to article nine of this title or section four hundred two of the correction law upon release or conditional release from a correctional facility, provided that the provisions of this article shall not be deemed to shorten or lengthen the time for which such person may be held pursuant to such article or section respectively; or (6) A person who has been determined to be a sex offender requiring civil management pursuant to this article.

MHL § 10.03(g).

condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." MHL § 10.03(i).

If the CRT finds the offender to require civil management, then the Attorney General may file a "sex offender civil management petition" in New York State court. MHL § 10.06(a). Within 30 days after the petition is filed, the court "shall conduct a hearing to determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10.06(g). At the conclusion of the probable cause hearing as described in § 10.06(g), the court "shall determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10.06(k). If the court so determines, it "shall order the respondent . . . committed to a secure treatment facility . . . [and] the respondent shall not be released pending the completion of [the] trial [contemplated in MHL § 10.07]." MHL § 10.06(k).

Under § 10.07, at the commitment trial, which is supposed to begin within 60 days of the probable cause determination, the jury (or judge if the right to a jury trial is waived) determines by clear and convincing evidence "whether the respondent is a detained sex offender who suffers from a mental abnormality." MHL §§ 10.07(a), (d). If such a determination is made, then the judge "shall consider whether the respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision." MHL § 10.07(f). If at the commitment hearing the court finds:

> by clear and convincing evidence that the respondent has a mental abnormality involving such a strong predisposition to commit sex

6

> offenses, and such an inability to control behavior, that the
> respondent is likely to be a danger to others and to commit sex
> offenses if not confined to a secure treatment facility, then the
> court shall find the respondent to be a dangerous sex offender
> requiring confinement.

MHL § 10.07(f).  Upon such a finding, the respondent "shall be committed to a secure treatment facility . . . until such time as he or she no longer requires confinement."  Id.  Once committed, the individual shall have a yearly psychiatric exam, and a right to be examined by an independent examiner.  MHL § 10.09(b).  In certain circumstances, the detained individual has a right to petition the court for an evidentiary hearing, and detention will continue only if the Attorney General can demonstrate by clear and convincing evidence that the respondent is still a dangerous sex offender requiring confinement.  MHL § 10.09(h).  While committed, sex offenders shall be kept in "secure treatment facilit[ies]," MHL § 10.06(k)(i), segregated from those who are not "sex offenders."  MHL § 10.10(e).  If the court grants a subsequent hearing based on the detainee's petition and finds that the detained individual suffers from a mental abnormality, but is no longer a dangerous sex offender, then the court will discharge the individual from custody but order a regimen of strict and intensive supervision and treatment.  MHL § 10.09(h).

If the judge does not find that the respondent is a dangerous sex offender requiring confinement, "then the court shall make a finding of disposition that the respondent is a sex offender requiring strict and intensive supervision, and the respondent shall be subject to a regimen of strict and intensive supervision and treatment."  MHL § 10.07(f).[4]  In making such a

---

[4] The statute allows the mental abnormality issue to be relitigated after two years of strict and intensive supervision, MHL § 10.11(f), and if a court agrees to hear a petition for discharge by an individual adjudicated to be a dangerous sex offender requiring civil confinement.  MHL §

finding, the court shall consider "the conditions that would be imposed upon the respondent if subject to a regimen of strict and intensive supervision, and all available information about the prospects for the respondent's possible reentry into the community." Id. An individual may petition every two years for modification or termination of the strict and intensive supervision. MHL § 10.11(f). Upon receipt of a petition for termination, the court may, in its discretion, hold a hearing where the Attorney General must show by clear and convincing evidence that the individual is still a sex offender in need of civil management. MHL § 10.11(h).

II.     Legal Standards

        A.      Preliminary Injunction

        To obtain a preliminary injunction the moving party must show irreparable injury and either (i) likelihood of success on the merits or (ii) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor. Green Party of New York State v. New York State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004); Tom Doherty Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 33 (2d Cir. 1995); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam).

        B.      Procedural Due Process

        Procedural due process claims are to be examined in "two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State . . . [and] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989) (citations omitted). Whether a deprivation affects a liberty or property interest can be a difficult question.

_____

10.09(h).

In this case, however, there is no question.  Persons affected by Article 10 are threatened with deprivation not merely of *a* liberty interest, but of liberty *tout court*, as the Act contemplates that those found within its scope may be confined against their will.

If a protected liberty interest is implicated by state action, then the Court must determine what process is due.  Due process is not a fixed concept, but flexible, and depends on the particular circumstances.  Zinermon v. Burch, 494 U.S. 113, 127 (1990).  The extent of process due is analyzed under the framework established by Mathews v. Eldridge:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976).  When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard.  Hamdi v. Rumsfeld,  542 U.S. 507, 533 (2004) (plurality opinion) (The "central meaning of procedural due process" is that parties "whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.  It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (citations and internal quotation marks omitted); Armstrong v. Manzo, 380 U.S. 545, 552 (1965); see also United States v. James Daniel Good Real Property, 510 U.S. 43, 53 (1993); Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971).

Though the Mathews v. Eldridge analysis requires an evaluation of each challenged statutory provision or instance of government deprivation, certain general comments are appropriate.  The personal interests implicated by Article 10 are fundamental human interests, including (i) liberty per se, which may be lost to involuntary commitment or strict probation-like conditions which must be complied with on pain of involuntary commitment;[5] (ii)  involuntary psychiatric or behavior modification medication or other treatment;[6] and (iii) the lifelong stigma attached to the label of sex offender that may adversely affect an individual's ability to live and

---

[5] "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  United States v. Salerno, 481 U.S. 739, 755 (1987).  "[A]n unchecked system of detention carries the potential to become a means for oppression and abuse."  Hamdi v. Rumsfeld, 542 U.S. 507, 530 (2004) (plurality opinion).  See also Vitek v. Jones, 445 U.S. 480, 492 (1980) ("'[A]mong the historic liberties' protected by the Due Process Clause is the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.'"), quoting Ingraham v. Wright, 430 U.S. 651, 673 (1977).  "[I]nvoluntary commitment to a mental hospital, like involuntary commitment of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law."  O'Connor v. Donaldson, 422 U.S. 563, 580 (1975) (Burger, C.J., concurring), citing Specht v. Patterson, 386 U.S. 605, 608 (1967), and In re Gault, 387 U.S. 1, 12-13 (1967).  See also Vitek, 445 U.S. at 491 ("[F]or the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty . . . [and] in consequence requires due process protection.") (citations and internal quotation marks omitted); see also Project Release v. Prevost, 722 F.2d 960, 971 (2d Cir. 1983).

[6] One has a liberty interest against "[c]ompelled treatment in the form of mandatory behavior modification programs" absent adequate justification.  Vitek, 445 U.S. at 492.  See also Mills v. Rogers, 457 U.S. 291, 299 n.16 (1975) (assuming without deciding "that involuntarily committed mental patients do retain liberty interests protected directly by the Constitution . . . and that these interests are implicated by the involuntary administration of antipsychotic drugs") (citations omitted);  Project Release v. Prevost, 722 F.2d 960, 979 (2d Cir. 1983) ("Although Mills did not definitively resolve the question of whether a liberty interest in refusing antipsychotic medication exists as a federal constitutional matter, the case appears to indicate that there is such an interest."); id. ("[I]t appears that New York State recognizes the right" to refuse antipsychotic medication).

work.[7]  An erroneous deprivation due to inadequate procedures in this context will likely lead to, at a minimum, substantial stigma and mandated strict supervision.  The governmental interests involved are also serious.  Individuals who are mentally ill and dangerous, and prone to the commission of sexual offenses, pose serious risks to our communities.  New York thus has a strong interest in ensuring the safety of potential victims of such offenses.

      C.     Involuntary Detention of Persons With Mental Illness

The Constitution does not guarantee an "absolute right in each person to be, at all times and in all circumstances, wholly free from restraint.  There are manifold restraints to which every person is necessarily subject for the common good.  On any other basis organized society could not exist with safety to its members."  Kansas v. Hendricks, 521 U.S. 346, 356-57 (1997) (citations and internal quotation marks omitted).  Civil commitment is appropriate in certain circumstances, but it "must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding.  Equally important, confinement must cease when those reasons no longer exist."  O'Connor, 422 U.S. at

---

[7] Due process is implicated not only when an individual's physical liberty is impaired, but also "[w]here a persons's good name, reputation, honor, or integrity is at stake because of what the government is doing to him."  Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971).  Harm to "reputation alone . . . is [not] 'liberty' . . . by itself sufficient to invoke the procedural protection of the Due Process Clause."  Paul v. Davis, 424 U.S. 693, 701 (1976).  The Second Circuit has required some additional impediment beyond harm to reputation alone to establish a constitutional deprivation.  See, e.g., Valmonte v. Bane, 18 F.3d 992, 999 (2d Cir. 1994); Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir. 1989).  The liberty interests implicated by involuntary civil commitment based on mental illness include "adverse social consequences to the individual . . . [and] [w]hether we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual."  Vitek, 445 U.S. at 492, citing Addington v. Texas, 441 U.S. 418, 425-26 (1979); Neal v. Shimoda, 131 F.3d 818, 829 (9th Cir. 1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender.").  See also Doe v. Pataki, 3 F. Supp. 2d 456, 469 (S.D.N.Y. 1998).

580 (Burger, C.J., concurring), citing McNeil v. Director, Patuxent Inst., 407 U.S. 245, 249-50

(1972) and Jackson v. Indiana, 406 U.S. 715, 738 (1972). States have, in "certain narrow

circumstances," provided for "forcible civil detainment of people who . . . pose a danger to the

public," and the Supreme Court has

> consistently upheld . . . involuntary commitment statutes when (1)
> the confinement takes place pursuant to proper procedures and
> evidentiary standards, (2) there is a finding of dangerousness either
> to one's self or others, and (3) proof of dangerousness is coupled
> . . . with the proof of some additional factor, such as a 'mental
> illness' or 'mental abnormality.'

Kansas v. Crane, 534 U.S. 407, 409-10 (2002), citing Hendricks, 521 U.S. at 357-58 (internal

quotation marks omitted). "[E]ven if . . . involuntary confinement [is] initially permissible [and

founded upon a constitutionally adequate basis], it [can] not constitutionally continue after that

basis no longer exist[s]." O'Connor, 422 U.S. at 575 (citation omitted);[8] see also Foucha v.

Louisiana, 504 U.S. 71, 78 (1992) ("[K]eeping [someone] against his will in a mental institution

is improper absent a determination in civil commitment proceedings of current mental illness and

dangerousness.").

    The substantive standards governing involuntary civil detention are well established: "A

finding of 'mental illness' alone cannot justify a State's locking up a person against his will and

keeping him indefinitely in simple custodial confinement." O'Connor, 422 U.S. at 575. "Mere

public intolerance or animosity cannot constitutionally justify the deprivation of a person's

---

[8] These constitutional concerns were reflected in the Kansas civil commitment statute at issue in Hendricks and Crane, where "[i]f, at any time, the confined person is adjudged 'safe at large,' he is statutorily entitled to immediate release." Hendricks, 521 U.S. at 364. The Kansas statute "permit[s] immediate release upon a showing that the individual is no longer dangerous or mentally impaired." Id. at 368-69.

physical liberty." Id. (citations omitted). Involuntary civil confinement "may entail indefinite

confinement, [which] could be a more intrusive exercise of state power than incarceration

following a criminal conviction." Project Release v. Prevost, 722 F.2d 960, 971 (2d Cir. 1983).

Though "involuntary civil commitment constitutes a significant deprivation that requires due

process protection, . . . the difference between civil and criminal confinement may nonetheless

be reflected in different standards and procedures applicable in the context of each of the two

systems–so long as due process is satisfied." Id. (citations and internal quotation marks

omitted). In the case of civil confinement, "due process requires that the nature and duration of

commitment bear some reasonable relation to the purpose for which the individual is

committed." Jackson, 406 U.S. at 738. However, "due process does not tolerate the involuntary

confinement of a nondangerous individual." Project Release, 722 F.2d at 972 (citations and

internal quotation marks omitted).

III.    The Challenged Provisions

        Plaintiffs do not challenge New York's authority to involuntarily commit individuals

who have in the past committed sexual crimes and are at present mentally ill and dangerous. Nor

can they, because the Supreme Court has held that such detention is constitutionally authorized.

See Hendricks, 521 U.S. at 356, 369-71 (holding that confinement of sex offenders based on

proof of mental abnormality and a finding of dangerousness does not violate substantive due

process, and rejecting claims that sexual offender detention provisions violate the Double

Jeopardy Clause or constitute impermissible ex post facto lawmaking). Plaintiffs' challenges

therefore leave untouched the central provisions of the new statutory scheme, which authorize

detention based on a finding that an individual who (i) has committed a sex crime (or the acts

which constitute the crime) and (ii) is mentally ill and dangerous may be involuntarily committed. Plaintiffs object, however, to some provisions of the statute that they claim permit an offender to be detained on an inadequate showing of these factors. Five of their six challenges to the statute relate to this basic concern. Their sixth challenge relates to the timing of the appointment of counsel.

A.      MHL § 10.06(f)

Article 10 authorizes detention both after the probable cause hearing and after the commitment hearing. However, Article 10 also authorizes detention of a potential sexual offender even *before* the probable cause hearing, and in advance of any judicial hearing, solely on the basis of an executive order of detention, and plaintiffs challenge the constitutionality of these pre-hearing detention provisions.

When an individual subject to the Act may be released from incarceration or parole before the CRT is able to make a determination as to whether the individual may be a sex offender in need of civil management, the Attorney General, if she "determines that the protection of public safety so requires," may file a "securing petition." MHL § 10.06(f).[9] The

_____

[9] The statute incorporates certain time-lines anticipating that the evaluation of the individual will be completed before an individual is scheduled for release. See, e.g., MHL § 10.05(b) (agencies shall give notice to the Attorney General and Commissioner of Mental Health 120 days prior to an individual's release); MHL § 10.05(g) (if the CRT determines that the individual is a sex offender requiring civil management, it shall give notice of this fact to the Attorney General and the respondent within 45 days of the Commissioner of Mental Health's receipt of the notice of the individual's release); MHL § 10.06(a) (Attorney General shall seek to file the sex offender civil management petition with the court within 30 days after receiving the case review team's finding). However, as certain of the provisions explicitly note, see, e.g., MHL §§ 10.05(g), 10.06(a), and the statute more generally provides, these deadlines are almost always aspirational, and the failure to meet these deadlines "shall not invalidate later agency action except as explicitly provided by the provision in question." MHL § 10.08(f). Thus, Article 10 anticipates that some individuals may be scheduled for release before the CRT can

14

filing of such a "securing petition" in and of itself requires that the individual shall be (or

remain) detained and "there shall be no probable cause hearing until such time as the case review

team may find that the respondent is a sex offender requiring civil management."  Id.[10]

Plaintiffs contend that these provisions violate the most basic tenets of due process:

notice to the individual and an opportunity to challenge the continued detention.  (MHLS Mot. 5-

7.)  Defendants contend that plaintiffs' concerns are overblown, and that their criticisms take the

statute out of context.  (D. Opp. 8-10.)  They insist that the securing petition provision actually

"protects rather than injures the respondent" because it ensures that a judge can only determine

whether an individual has a "mental abnormality" with the benefit of technical clinical evidence

provided by the CRT evaluation.  (Id. at 8.)  Defendants also suggest that "the securing

provisions come into play only after notice" and only in situations where "the protection of

public safety so requires."  (Id. at 10.)

_____

complete its work and the normal judicial process is instituted.

[10] The full text of the provision states:

> Notwithstanding any other provision of this article, if it appears
> that the respondent may be released prior to the time the case
> review team makes a determination, and the attorney general
> determines that the protection of public safety so requires, the
> attorney general may file a securing petition at any time after
> receipt of written notice pursuant to subdivision (b) of section
> 10.05 of this article. In such circumstance, there shall be no
> probable cause hearing until such time as the case review team
> may find that the respondent is a sex offender requiring civil
> management. If the case review team determines that the
> respondent is not a sex offender requiring civil management, the
> attorney general shall so advise the court and the securing petition
> shall be dismissed.

MHL § 10.06(f).

15

On these points, defendants' arguments are unpersuasive.  It is true that some form of "notice" must be given in advance of a securing petition; however, it is not notice given *to* the individual subject to the petition, and it is not notice *regarding* the potential detention by securing petition.  The statute anticipates that the agency that has jurisdiction over a person who may be a detained sex offender nearing release will give notice to the Attorney General and the Commissioner of Mental Health within 120 days before such a person's release.  MHL § 10.05(b).  The Attorney General is authorized to issue a securing petition "at any time after receipt of written notice" pursuant to § 10.05(b), regardless of whether the Commissioner of Mental Health has received such notice.  MHL § 10.06(f).  Whatever notice might in due course be given to a respondent about Article 10's potential applicability to him in advance of the filing of a securing petition,[11] the statute unquestionably does not require that anyone give notice to the respondent, in advance of the detention, that he will be detained by a securing petition.  Moreover, the statute gives an individual no opportunity to contest the petition, and thus his detention, in advance of its issuance.  In addition, individuals subject to securing petitions would not necessarily have state-appointed counsel to assist them in determining how to respond to a securing petition.  MHL § 10.06(c) (appointment of counsel is triggered by the filing of a sex offender civil management petition or the request by the attorney general for a court-ordered psychiatric examination, not the filing of a securing petition).

Defendants also contend that any deprivation of liberty will be modest, because the statute requires a probable cause hearing to be held within 72 hours of the filing of the securing

---

[11] See, e.g., MHL § 10.05(e) ("If the person is referred to a case review team for evaluation, notice of referral shall be provided to the respondent.").

petition. (D. Opp. at 8). However, this is not strictly accurate. Though the probable cause hearing is initially scheduled to be held within 72 hours of the filing of a securing petition, the probable cause hearing may be delayed due to (i) delay caused or consented to by the individual, or (ii) a showing by the Attorney General, to the satisfaction of the court, of "good cause why the hearing could not . . . commence." MHL § 10.06(h). Moreover, the statute provides that in the event of the filing of a securing petition, "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management." MHL § 10.06(f). Thus, the confinement occasioned by the securing petition could extend well beyond 72 hours.

The Second Circuit has upheld against constitutional challenge brief detentions of less than 72 hours in certain situations involving persons who may be mentally ill and dangerous to themselves or others. Project Release, 722 F.2d at 966, upheld a statutory provision authorizing involuntary detention for 72 hours of a previously voluntary admittee to a mental hospital who gave notice of his desire to leave, so as to give the hospital administrator sufficient time to determine whether the individual should be converted from voluntary to involuntary commitment. Charles W. v. Maul authorized detention for less than 72 hours in a New York State psychiatric center of an individual adjudicated incompetent to stand trial on a misdemeanor charge, in order to "evaluate whether he presented a danger to himself or others warranting invocation of New York's civil commitment law." 214 F.3d 350, 353 (2d Cir. 2000).

The situation surrounding the detentions authorized here appears different from those involved in Project Release or Maul. First, the nature of the dilemma faced by New York is different. Both Project Release and Maul involved situations where the release of the potentially

17

dangerous or ill person was necessarily unpredictable.  A hospital director does not know that a

voluntary admittee wishes to leave until the admittee gives the director notice of those wishes.

Similarly, when, or whether, a criminal defendant will be adjudicated incompetent to stand trial

is also unpredictable, and the "state will not necessarily be prepared to undertake civil

commitment proceedings immediately after criminal charges are dismissed."  Maul, 214 F.3d at

359.  In those situations, therefore, brief emergency detention periods are in some sense

functionally necessary.  Here, in contrast, the conclusion of a term of parole or imprisonment is

generally a predictable event, and one for which, at least in the normal course of events, the CRT

has at least 120 days in advance of the offender's release to prepare by conducting its

investigation.

　　　　Second, the procedures and deadlines involved in the 72-hour period of review here

appear to be less rigorous than those at issue in Project Release and Maul.  Under the regulatory

scheme challenged in Project Release, upon written notice of the patient's desire to leave, the

hospital director could continue that person's detention based on "reasonable grounds for belief

that the patient may be in need of involuntary care and treatment."  722 F.2d at 966, citing MHL

§ 9.13(b).  During that period, the director "must have two physicians examine the patient and

report their findings and conclusions separately to the director, who must then either release the

patient or apply for a court order authorizing involuntary retention."  Id., citing N.Y. Comp.

Codes R. & Regs. tit. 14, § 15.7 (1980).  Upon application to a court, written notice is given to

the patient and the patient's nearest known relative, and to a number of other parties (including

Mental Health Information Service, an organization that provides information and assistance to

patients and others interested in their welfare), any of whom can demand a judicial hearing to be

18

held within three days of the court's receipt of such a demand.  Id.  The normal procedures for court authorization of detention of an involuntary patient then apply.  Id., citing MHL §§ 9.13(b), 9.33.  In Maul, the government policy authorizing detention required evaluation within 72 hours of a finding of incompetency to stand trial before initiating civil confinement proceedings.  214 F.3d at 356.

Here, in contrast, the judicial review at the 72-hour stage may be no more than a determination that the Attorney General has shown "good cause" for delaying the CRT evaluation.  The statute does not provide *any* absolute outer limit to the time that a CRT may spend in making its determination in the wake of a filed securing petition.  There are no standards in the statute for what may constitute "good cause," no requirement that this "good cause" showing be established by any sort of hearing, and no requirement that petitioner participate in such a process.  Furthermore, the "good cause" finding appears to relate to the existence of an excusable failure to complete the CRT evaluations, and is not necessarily a mechanism by which the judge may review the Attorney General's determination that the individual is sufficiently dangerous so as to require a securing petition.  Though the detention may be based on an executive branch determination that an individual is dangerous, that determination may be unreviewable by a court for a potentially indefinite period of time.

The securing petition thus may operate as a mechanism by which an executive branch official is empowered to order that an individual be held in custody beyond his sentence or judicial order of confinement on the mere say-so of the Attorney General.  It may operate to authorize executive detention without notice to the individual being detained, without an opportunity to be heard, without advance judicial approval of the detention.  There is no

19

provision for immediate review by any court that the emergency action was justified and that the individual is in fact dangerous or may be dangerous, and no requirement that the court make an immediate decision as to whether an offender merits detention.  Moreover, the detention could potentially last indefinitely, where "good cause" is shown why the CRT is unable to render a decision as to whether the individual may suffer a "mental abnormality" as defined by the statute.

However, this is not a case in which any plaintiff is challenging his or her confinement pursuant to a securing petition.  Rather, the plaintiffs here are challenging the provisions of § 10.06(f) as facially unconstitutional.  Such plaintiffs bear a heavy burden.  Facial invalidation of a statute is an extraordinary remedy and generally disfavored.  National Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998) (Facial challenges to statutes are "generally disfavored," as facial invalidation is "strong medicine" that "has been employed by the Court sparingly and only as a last resort."), citing FW/PBS, Inc. v. Dallas, 493 U.S. 215, 223 (1990), and Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973).  "A facial challenge will only succeed if there is no set of circumstances under which the challenged practices would be constitutional."  Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 347 (2d Cir. 1998).  Therefore, a court need only determine "whether there are 'any circumstances under which the [provisions] of the Act are permissible in order to uphold the Act.'"  Velazquez v. Legal Services Corp., 164 F.3d 757, 763 (2d Cir. 1999), quoting Able v. United States, 88 F.3d 1280, 1290 (2d Cir.1996).  At least outside the special context of the First Amendment, plaintiffs challenging the facial constitutionality of a statute must demonstrate that the statute is invalid "in all applications."  Brooklyn Legal Servs. Corp. v. Legal Servs. Corp., 462 F.3d 219, 228 (2d Cir. 2006).

Although the analysis above suggests that under certain circumstances the broad authorization of confinement by direction of the Attorney General may operate unconstitutionally, whether by extending detention for too long a period or by permitting detention without a genuine emergency, the present record does not demonstrate that the statute cannot be administered or interpreted in a way to avoid these problems. To obtain a preliminary injunction, plaintiffs have the burden of demonstrating a likelihood of success in proving that "each time that [the] statute is enforced, it will necessarily yield an unconstitutional result." Nat'l Abortion Fed'n v. Gonzales, 437 F.3d 278, 293-94 (2d Cir. 2006) (Walker, C.J., concurring).

There are situations, however, in which an executive official, with cause to believe that an individual is dangerous, can constitutionally detain such an individual in advance of a court hearing. See, e.g., County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991) (noting that probable cause hearing must follow within 48 hours of warrantless arrest); see also Project Release, 722 F.2d at 966; Maul, 214 F.3d at 353. The constitutionally of the detention depends, among other things, on (i) the reason for the detention, including existence of good or probable cause to detain the individual in the first place, and the nature of the exigency requiring action without prior notice and hearing, (ii) the nature of the detention, including the length of the detention pending the judicial hearing, and (iii) the nature and meaningfulness of the judicial review, when it actually comes. Thus, there exist situations in which an individual who may be a sexual offender may constitutionally be detained in advance of a decision by an impartial decision maker that the individual is in fact dangerous. However, detention in advance of meaningful review by a judicial officer or other impartial factfinder is usually only appropriate

for a matter of days.  See, e.g., County of Riverside, 500 U.S. at 56; Project Release, 722 F.2d at 966; Maul, 214 F.3d at 353.

Thus, while plaintiffs have raised serious and legitimate concerns about the potential operation of § 10.06(f), they have not established that they are likely to succeed in establishing the facial invalidity of this provision.  It is not possible to conclude on the basis of the present record that the statute will necessarily function in an unconstitutional manner.  In the first six months of the statute's operation, the parties agree, securing petitions have been used only twice.[12]

In these cases, it appears that the periods of detention without judicial review were brief, and the record is unclear as to the reasons, if any, why the CRT was unable to complete its review before the offender's scheduled release.

It is conceivable that the statute may be susceptible to constitutional application.  If there are situations in which a potentially dangerous offender who may qualify as a mentally abnormal sex offender requiring confinement is unexpectedly scheduled for imminent release, and the detention is limited to a brief period before a judicial hearing, the resulting emergency may justify a short period of detention pending such a hearing.  At this early stage of the proceedings, it is unclear whether such situations exist.  A factual record detailing the circumstances under which the relevant authorities become aware of the scheduled release of offenders, and how the

---

[12]  The first securing petition was filed on the date the Act became effective.  (Letter of Edward J. Curtis, Esq., to the Court, dated September 21, 2007, at 2.)  The second securing petition was filed on July 11, 2007, and withdrawn in two days.  (Letter of Edward J. Curtis, Esq., to the Court, dated September 26, 2007, at 1.)

CRTs operate, may reveal whether genuine emergency conditions warranting executive detention actually exist.

But plaintiffs have not established that it is likely that such conditions do not exist.  And in any event, as a matter of equitable discretion, an injunction on these facts would be inappropriate.  Since the statute was recently enacted, New York State courts have not yet had an opportunity to interpret these provisions.  As a matter of equitable discretion, it is preferable to give the New York State courts the opportunity to determine the proper scope of a New York law before a federal court declares whether it offends the federal Constitution.  New York courts may well interpret the securing petition as a mere emergency device, only to be utilized in compelling circumstances, and may narrowly interpret the exceptions to the provision of judicial review within 72 hours.  Depending upon how New York courts interpret their own statute, there may be no need to reach any federal constitutional issue.

In short, this Court declines to issue a preliminary injunction against a provision that may rarely if ever be used, or if used, may be capable of being interpreted or applied in a manner that does not offend the due process clause.  Because a fuller factual record is necessary for the Court to determine whether the statute may be capable of constitutional application, both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss will be denied as they pertain to MHL § 10.06(f).

B.    MHL § 10.06(k)

Once the Attorney General, based on the report of the CRT, determines that an individual may be a sex offender in need of civil management, he may file a "sex offender civil management petition" with a New York court.  MHS § 10.06(a).  Within 30 days of the filing of

the sex offender management petition, the court must conduct a hearing without a jury to determine if there exists "probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10.06(g). If, at the conclusion of the hearing, the court finds such probable cause, the judge is required to commit the individual to a secure treatment facility, where the individual shall be detained pending the civil commitment trial. MHL § 10.06(k). Detention may last more than 60 days.[13]

Plaintiffs contend that these provisions are unconstitutional because they mandate the confinement of an individual pending the commitment trial without a finding that the individual detained is in fact dangerous, or even without probable cause to believe that the individual *might* be dangerous. An evaluation of this contention requires careful attention to the details of the regulatory scheme.

It is undisputed that when a proceeding may result in an adjudication of detention, a court may detain the defendant pending adjudication of the matter based on a finding of probable cause to believe the facts justifying ultimate detention exist, plus a finding that lesser conditions of supervision during pendency of the action will not be sufficient to guarantee the safety of the community. That is the teaching of United States v. Salerno, 481 U.S. 739 (1987), which upholds a statute permitting pre-trial detention of defendants in criminal cases on just such a

---

[13] The statute requires a trial to begin within 60 days of the probable cause hearing. MHL § 10.07(a). However, since the statute mandates detention through the completion of the trial, MHL § 10.06(k)(iii), the statute authorizes detention beyond 60 days. In the first case that went to trial, the time of detention extended to 80 days. (Tr. 53.) In complicated trials, detention may even be longer. Both the significant period of detention authorized, as well as the purpose of the detention itself, separate this case from other statutes which authorize very short periods of detention for the purpose of determining whether or not an individual is dangerous or is in need of confinement. See Project Release, 722 F.2d at 966 (72 hours); Charles W. v. Maul, 214 F.3d at 358-59 (2d Cir. 2000) (less than 72 hours).

showing.  There is no reason why a similar standard should not apply in civil commitment

proceedings: if there is probable cause to believe the respondent is likely to be adjudicated a

dangerously mentally ill person or a sex offender requiring confinement as defined in the Act,

the same need to guarantee the safety of the community that warrants detention of a criminal

defendant while he is still presumed innocent warrants a similar detention pending trial of

potentially dangerous persons who have not yet been found to require civil commitment.

Plaintiffs do not dispute this general principle.  They argue, however, that unlike the pre-

trial detention regime upheld in Salerno, the statute at issue here requires the detention pending

trial of *all* respondents as to whom there is probable cause that they qualify as sex offenders

requiring civil management, without an individualized judicial determination that they cannot

safely be at liberty pending adjudication.  They contend, in effect, that this is analogous to a

statute that denied bail to *all* criminal defendants pending trial, based only on a finding of

probable cause to believe they committed an offense that *might* lead to a prison sentence.

Defendants respond that the analogy fails, because a finding of dangerousness is implicit

in the probable cause determination required by MHL § 10.06(k).  They note that the required

finding, is among other things, a finding of probable cause to believe that the respondent suffers

from a mental abnormality which is defined to include only those mental abnormalities which

"predispose[] [an individual] to the commission of conduct constituting a sex offense and that

results in that person having serious difficulty in controlling such conduct."  MHL § 10.03(i).

Therefore, defendants contend, a degree of dangerousness sufficient to justify 60 days of

detention pending a trial is embedded into the definition of mental abnormality itself.

But that is not quite so.  What is relevant to the pre-trial release decision is not merely a generalized notion that a person presents some degree of potential danger – if that were so, any person that there is probable cause to believe committed a crime of violence could be detained without more – but also a finding that the person is sufficiently dangerous that less intrusive conditions than detention cannot guarantee the safety of the community pending trial.

Article 10 itself makes clear, however, that not all persons who have a mental abnormality sufficient to meet the definition of a "sex offender requiring civil management" require actual confinement.  Under the statute, "sex offender requiring civil management" is a catch-all category that includes individuals subject to the act who are *not* individuals "likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL §§ 10.03(e), (q), (r).  At least some individuals who fit this broader category will *not* be subject to detention, but only to parole- or probation-like conditions of supervision while at liberty in the community, even *after* a jury finding that they have been *proven*, by clear and convincing evidence, to be sex offenders in need of civil management.

The Act is not simply a mechanism to extend the confinement of individuals currently incarcerated; it can also operate to extend parole-like conditions to persons who are currently on parole.  In certain situations, New York apparently believes that strict and intensive supervision of (and medication and therapy for) a respondent, under conditions resembling parole supervision, is adequate to protect the community.  Defendants do not contest that persons across a broad spectrum of treatment needs and threat levels may be classified as "sex offenders requiring civil management."  That there is probable cause to believe that an individual requires

26

some kind of civil management, and may be dangerous *if not treated*, does not necessarily mean

that such a person will be dangerous *if released*, and would therefore require detention.[14]

Nevertheless, the Act requires the detention, pending trial, on a mere finding of probable

cause to believe that the respondent suffers from a "mental abnormality," of those for whom

detention is not a necessary or intended remedy, even if such abnormality is proven at trial.

Mandatory detention pending trial is triggered by a court finding of probable cause to believe

that a person is a "sex offender requiring civil management," not by a finding of probable cause

to believe that such a person is dangerous or requires secure confinement.  Under the Act, then, a

person may be detained for 60 days or more based on a determination that there is probable

cause to believe that he may have committed a sexual felony and may have a mental

abnormality.[15]  Comparing a federal sex offender statute's definition of "sexually dangerous"

demonstrates how Article 10's definition of "mentally abnormal" does not incorporate a finding

of dangerousness.  The comparable federal sex offender statute defines a "sexually dangerous"

---

[14] The presence of a mental abnormality combined with the commission of a past crime may be sufficient to institute proceedings against an individual, and surely the commission of past sexually violent crimes is relevant to a psychiatrist's or judge's determination of whether an individual is at present violent. Hendricks, 521 U.S. at 357 ("[P]revious instances of violent behavior are an important indicator of future violent tendencies.") (citations and internal quotation marks omitted).  However, it is current dangerousness, not past crimes, which ultimately justifies civil detention in these situations.  See, e.g., id. (the act held constitutional in Hendricks "unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement").

[15] Article 730 defendants, a subset of the larger category of "detained sex offender," MHL § 10.03(g)(2), may have only been indicted for a crime before a court found them incompetent to stand trial.  N.Y. Crim. Proc. Law ("CPL") § 730.50(1).  Article 10 requires that only those 730 defendants that "did engage in the conduct constituting" the offense be subject to Article 10.  However, such a determination is presumed at the probable cause stage, MHL § 10.06(j)(iii), and only needs to be proved by clear and convincing evidence at the trial stage, MHL § 10.07(d).

individual to be one who "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation *if released*." 18 U.S.C. § 4247(a)(6) (italics added). Likewise, by provision of Article 10, a "dangerous sex offender requiring confinement" is a person who suffers from a mental abnormality such that "the person is likely to be a danger to others and to commit sex offenses *if not confined to a secure treatment facility*." MHL § 10.03(e) (italics added). Both incorporate a finding that the individual would likely be sexually violent *if released*. In critical contrast, Article 10's definition of mental abnormality includes those individuals whose tendencies may be controlled by remedies that fall short of confinement, such as medicine, treatment, or some other form of supervision.

The intervenor's situation illustrates the point.[16] He alleges that in the Article 10 proceeding against him, New York seeks only an order, in effect, of continued parole. (Intervenor Complaint ¶¶ 4, 21, 26.) Such parole-like community treatment is apparently all New York contends is required, and all the State asks the Court to impose if a jury finds that he indeed requires any treatment at all. Such treatment without detention, indeed, is all that was imposed on the intervenor before institution of proceedings under the Act.

Nevertheless, under § 10.06(k), upon a finding of probable cause to believe that the intervenor may have a mental abnormality as defined by the statute, a person in the intervenor's

---

[16] At this stage of the proceedings, the Court makes, and can make, no findings on the facts of the intervenor's case. Rather, the Court assumes the truth of the intervenor's allegations for the purposes of this discussion. The point is not whether these facts are indeed true as to the intervenor, but simply that what he contends are the facts of his case illustrate the conceded structure of the statute. Indeed, the Court has been advised that since the briefing in this case, the intervenor has been detained on a charge of parole violation.

situation must be automatically detained pending trial.  Such detention is potentially

catastrophic.  Not only will the intervenor lose his liberty, but he will likely lose his job and his

house, and default on loans.  (Id. ¶ 33.)  He will thus, by mandatory operation of the statute, be

deprived of more liberty *before* he is adjudicated in need of treatment, based on a mere showing

of probable cause to believe treatment is required, than New York seeks to impose *after* he is

shown by clear and convincing evidence to need treatment.  This is perverse, and at oral

argument the State was unable to give any rational explanation of how this furthers any

legitimate government interest.[17]  Nor can it – there is no convincing reason that an

individual should be detained for a substantial period of time pending a trial to determine

whether a person does or does not need outpatient treatment.

The Supreme Court has never held that an individual can be detained for a substantial

period of time based on mental incapacity alone.  See, e.g., O'Connor, 422 U.S. at 575 ("A

finding of 'mental illness' alone cannot justify a State's locking up a person against his will and

keeping him indefinitely in simple custodial confinement.").  Those civil commitment statutes

that the Supreme Court has upheld require a specific "finding of dangerousness either to one's

self or to others" that "links that finding to the existence of a 'mental abnormality' or

'personality disorder' that makes it difficult, if not impossible, for the person to control his

dangerous behavior."  Crane, 534 U.S. at 410, citing Hendricks, 521 U.S. at 357-58.  Due

process "does not tolerate the involuntary confinement of the nondangerous individual."  Project

Release, 722 F.2d at 972 (citations and internal quotation marks omitted).

---

[17] See (Tr. at 54-59); (id. at 59, "It is a difficult thing to justify.  I have explained why I
believe it's there, and that's about all I can offer.").

In practice, the automatic detention provisions operate less as a precise tool to determine who is dangerous enough to be committed pending trial, and more as a hammer to coerce individuals to enter into plea arrangements with the State, and thereby accept both designation as a sex offender and intensive ongoing treatment in order to avoid spending what may be more than 60 days in involuntary confinement.  A respondent as to whom post-trial detention is not sought will have an overwhelming incentive to agree to an adjudication that he is a sex offender in need of treatment, and to accept continuation of community supervision, rather than contest the State's case, in order to avoid a potentially lengthy period of detention pending trial, even if he believes he may avoid any adverse consequence by going to trial.

Detention will of course be warranted in some cases; however, it should be triggered, as the Legislature notes, "[i]n extreme cases" and only for "the most dangerous offenders."  MHL § 10.01(b).[18]  In contrast, § 10.06(k) extends automatic detention to all individuals who may receive treatment subject to Article 10, without a judicial proceeding to determine dangerousness, and with no rational basis for determining whether the particular individual would pose a danger to the community if released.  New York may not automatically detain any individual who may be subject to the statute for a significant period of time without proving that there is at least probable cause to believe that he is dangerous.[19]

_____

[18] In other portions of the brief, defendants note that the "array of protections, evaluations, judicial determinations and necessary findings which are built into the legislative scheme provide ample constitutional protections, at both the probable cause and trial stages." (D. Mot. 12-13.)  However, at no point previous to the mandatory detention does any person at any level make any determination that an individual is so dangerous as to necessitate detention.

[19] Defendants argue that in order to mount a successful facial challenge to a statute, plaintiffs must establish that there is no set of circumstances under which the statute would be valid. (D. Opp. 29, quoting Salerno, 481 U.S. at 745.)  However, MHL § 10.06(k) can never be

Plaintiffs have thus demonstrated a likelihood of success on the merits with respect to the unconstitutionality of MHL § 10.06(k). Plaintiffs have also demonstrated irreparable injury. When a complaint alleges denial of a constitutional right, irreparable harm is presumed. Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984). Unjustified confinement to a mental institution is a "massive curtailment of liberty." Vitek, 445 U.S. at 491. Being coerced into accepting a designation of "mentally abnormal sex offender" is also highly stigmatic. See Vitek, 445 U.S. at 492; Neal v. Shimoda, 131 F.3d 818, 829 (9th Cir. 1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender."). The harm to respondent either in being involuntarily committed without a finding of dangerousness or in being coerced to accept a designation of sex offender without an opportunity to contest the Attorney General's petition is both grave and irreparable.

This dispute must be resolved with urgency because respondents in the civil commitment proceedings are entitled to contest the State's case against them. However, if they know that they will be detained pending trial, where the pre-trial consequences are more severe than the post-trial consequences even were they to be adjudicated at the commitment trial to be a sex offender in need of civil management, then there is overwhelming and enormous pressure for an individual to accept the designation of sex offender and related treatment rather than face the 60 days of involuntary confinement. This statutory provision raises serious due process concerns with respect to all individuals who may be subject to its terms, not only because it does not

---

constitutional, because individuals subject to these provisions, and faced with a substantial period of detention, are entitled to an individualized determination that they are in fact dangerous. The question is not whether *detention pending trial* will ever be valid – plaintiffs concede it sometimes will be – but whether *mandatory* detention pending trial, without the showing of dangerousness necessary to justify such detention, is on its face invalid.

require a finding of dangerousness before a period of substantial involuntary commitment, but also because it functions as a club to coerce waivers of very serious and important rights.

Plaintiffs have demonstrated a likelihood of proceeding on the merits as well as irreparable injury. Section 10.06(k) is inherently coercive, and plaintiffs' motion for a preliminary injunction will be granted insofar as the section requires detention pending trial absent a specific, individualized finding of probable cause to believe that a person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during pendency of the proceedings.

C.      MHL § 10.06(j)(iii)

Plaintiffs also challenge a provision of the Act that forbids a class of individuals known as Article 730 defendants from contesting at the probable cause hearing the facts that form the basis of the criminal charges against them. Article 730 defendants are individuals who have been charged with a crime and found incompetent to stand trial pursuant to Article 730 of the New York Criminal Procedure Law, NY Crim. Proc. Law ("CPL") §§ 730.10–70.[20] MHL §

---

[20] Article 730 authorizes criminal courts to order psychiatric investigations of criminal defendants under certain circumstances and when the court "is of the opinion that the defendant may be an incapacitated person." CPL § 730.30(1). Upon the receipt of an examination order, two qualified psychiatric examiners must examine the defendant to determine his capacity. CPL § 730.20(1). If the examiners are not of the same opinion regarding the capacity of the defendant, a third psychiatric examiner must examine the defendant. CPL § 730.20(5). When the examiners are not unanimous in their opinion that the defendant is a dangerous incapacitated person, the court must conduct a hearing to make that determination. CPL § 730.30(4). Where the examiners are unanimous, the court may *sua sponte* conduct a capacity hearing, and must do so on motion by the defendant or the district attorney. CPL § 730.30(3). If the court concludes that the defendant is not incapacitated, the criminal action against him will proceed. CPL § 730.50(1). If the court is satisfied that the defendant lacks the capacity to assist in his defense, or if no party objects to the unanimous conclusion of the psychiatrists that the defendant is incapacitated, the court must issue either an order of observation or an order of commitment. CPL § 730.50(1). In the case of those charged with non-felony offenses, upon the order of

10.03(g)(2).  Although these individuals have never been found guilty of a crime, nevertheless a respondent's commission of a sex offense shall be "deemed established" and shall not be re-litigated at the probable cause hearing where it "appears that . . . the respondent was indicted for such offense by a grand jury but found to be incompetent to stand trial for such offense."  MHL § 10.06(j)(iii).

Plaintiffs attack these procedures, pointing out that Article 730 defendants may be detained pending an Article 10 trial without any finding that they committed the underlying offense charged, while all other persons to whom the Act applies have been found to have committed all of the elements of the offense charged.  (MHLS Mot. 16.)  Plaintiffs claim that this provision violates both due process and equal protection.

Plaintiffs' due process argument is founded on the concern that an individual may be detained following the probable cause hearing pending the commitment trial based on insufficient evidence that he in fact committed a crime and is in fact dangerous.  Defendants argue that indictment by a grand jury demonstrates the existence of "legally sufficient evidence" to establish that a person committed such an offense.  (D. Mot. 20, citing CPL §§ 190.65(1)(a)-(b) & 70.10(1)-(2)).  Plaintiffs rightly point out that neither an indictment nor a finding of incompetence establishes guilt.  However, detention pending criminal trial does not require a finding that the defendant in fact committed the crime charged, but only probable cause to

---

observation or commitment the court must dismiss the criminal indictment with prejudice.  CPL § 730.50(1).  In the case of those charged with felony offenses, the criminal action may proceed against the defendant if the defendant regains capacity.  CPL §§ 730.50(2)-(3).  A defendant charged with a felony but found unable to stand trial cannot be detained in the aggregate for longer than two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment.  CPL § 730.50(3).

believe that the individual committed an offense (and is dangerous or a flight risk). See, e.g.,

Salerno, 481 U.S. at 749, 755; Bell v. Wolfish, 441 U.S. 520, 534 (1979). In criminal cases,

moreover, an indictment by a grand jury is sufficient to establish probable cause. CPL §

190.65(1); U.S. v. Beyer, 426 F.2d 773, 774 (2d Cir. 1970). If an indictment is sufficient to

conclusively establish probable cause that the person committed the offense at issue in the

criminal proceeding, then surely it is sufficient to perform the same function in a civil

commitment proceeding. Article 730 defendants, like other persons subject to the Act, will have

the opportunity to contest the State's case against them at the commitment trial. So long as they

are detained pending trial based on an individualized finding of dangerousness and mental

abnormality (see discussion above regarding MHL § 10.06(k)), due process requires no more

than a probable cause finding with respect to the underlying alleged offense.

Plaintiffs' contention that this provision violates equal protection is also unpersuasive.

Unlike others subject to the Act who have been convicted of crimes, individuals who lack

capacity to assist in their own defense may not constitutionally be tried; and definitive findings

about whether such a defendant in fact committed the charged crime are thus precluded. See,

e.g., Cooper v. Oklahoma, 517 U.S. 348, 354 (1996) ("A defendant may not be put on trial

unless he has sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding . . . [and] a rational as well as factual understanding of the proceedings

against him.") (citations and internal quotation marks omitted). New York has not had the

opportunity to try Article 730 defendants in advance of the Article 10 proceedings. Their

inability to stand trial, however, should not prevent Article 730 defendants from being

committed pursuant to an otherwise constitutional sexual offender commitment scheme. Persons

34

who are unable to stand trial may still have committed violent sexual crimes, be mentally ill, and pose a serious danger to the community.  New York has a strong interest in detaining and treating such individuals.  New York also has a strong interest in preventing the probable cause hearing, intended as an efficient screening mechanism, from turning into the first of two trials.  That some persons subject to the Article 10 proceedings have been found guilty of crimes while others have not does not deny equal protection to either group.

Plaintiffs have not demonstrated a likelihood of success on the merits in their claims that MHL § 10.06(j)(iii) is facially unconstitutional, and subject to the other provisions of this opinion, plaintiffs' motion for preliminary injunction with respect to this provision is denied.  Moreover, defendants' motion to dismiss the complaint will be granted as it pertains to plaintiffs' attack of MHL § 10.06(j)(iii), because as a matter of law, the probable cause established by an indictment is a sufficient showing of potential guilt to warrant pretrial detention where an individualized showing of mental abnormality and dangerousness have been made.

D.    MHL § 10.07(d)

The statute predicates detention after the commitment trial on findings that an individual is (i) a sex offender who is (ii) mentally ill and (iii) dangerous.  The vast majority of persons subject to the Act have been found by a jury beyond a reasonable doubt to have committed at least one crime.[21]  For two groups, however, the Act authorizes detention following the commitment trial of individuals who have not been convicted of any crime.  The first group

---

[21] In most cases, that crime will have been determined by a jury, beyond a reasonable doubt, to have been sexual in nature.  There are certain circumstances in which that is not the case, as discussed in Part III E of this Opinion, below.

consists of those persons who, at a criminal trial, had been found by a jury beyond a reasonable doubt to have committed the conduct constituting the offense charged, but were also found to be not guilty by virtue of some mental disease or defect.  MHL § 10.03(g)(3); see also NYPL § 40.15.  The second group consists of Article 730 defendants, those persons charged with sex offenses but determined by a court to have been so incapacitated as to have been unable to help prepare their own defense, and therefore unable to stand trial.  MHL § 10.03(g)(2).  For such defendants, the statute permits post-trial detention where the Attorney General can "prov[e] by clear and convincing evidence [at the commitment trial] that respondent did engage in the conduct constituting [the sex] offense" for which the Article 730 defendant was indicted.  MHL § 10.07(d).  Therefore, of all individuals subject to the Act, only the Article 730 defendants face a designation of "sex offender," and potentially involuntary detention, without having been found beyond a reasonable doubt to have committed the acts which constitute *any* crime, sexual or otherwise.

Plaintiffs attack the provisions relating to the post-trial detention of these Article 730 defendants, claiming that the procedures violate due process.  Defendants, relying on Addington v. Texas, 441 U.S. 418 (1979), insist that the procedures set forth in the statute are adequate, because facts necessary to support involuntary civil commitment need only be found by clear and convincing evidence.  (D. Opp. 21-22.)

Defendants' argument is not without force.  As a general matter, plaintiffs concede that an individual may be civilly committed based on a finding, by clear and convincing evidence, that an individual is mentally ill and dangerous.  (See Tr. at 35, 36-38.)  Plaintiffs concede this, as they must, because the Supreme Court's opinion in Addington supports exactly that

36

proposition, holding that an individual can be indefinitely civilly committed upon a showing by clear and convincing evidence that an individual is mentally ill and would be a danger if released. 441 U.S. at 420, 433. See also Hollis v. Smith, 571 F.2d 685, 692, 695 (2d Cir. 1978). Indeed, Article 730 defendants who may be detained under Article 10 may have been committed pursuant to just such a civil commitment scheme,[22] and presumably the legislature could, if it chose, permit lengthier commitment for such individuals than is currently permitted by Article 730.[23]

But Article 10 is not a mere civil commitment statute that may apply to any citizen. Rather, it applies only to those who have committed a sexual offense (or at least, the conduct constituting such an offense). The Article 10 respondent is labeled not merely a person in need of treatment, but a "sex offender," a label premised on the conclusion that the accused committed a crime (or at least, the conduct constituting a crime). Application of the stigma associated with

---

[22] See MHL § 10.03(g)(2) (Article 730 defendants must have been charged for committing a sex offense.); MHL § 10.03(p) (All sex offenses are felonies.); CPL § 730.50(1) (If the court determines that defendant is an incapacitated person it must adjudicate defendant an incapacitated person, and "[w]hen the indictment charges a felony . . . it must issue an order of commitment . . . for care and treatment in an appropriate institution for a period not to exceed one year from the date of such order."); CPL § 730.50(2) (upon the conclusion of a period of confinement pursuant to Article 730, when the State believes that the defendant continues to be incapacitated, it can apply for an order of retention, and if the court adjudicates the defendant an incapacitated person, it must issue an order of retention for a period not to exceed one year); CPL § 730.60(6) (If an Article 730 defendant is about to be released and the court determines that the defendant is a danger to himself or others, then "the court shall issue an order to the commissioner authorizing retention of the committed person in the status existing at the time notice was given hereunder, for a specified period, not to exceed six months.").

[23] See CPL § 730.50(3) (The civil detention for a defendant charged with a felony but found unable to stand trial "must not exceed two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment.").

a finding of criminality elevates the statute beyond the ordinary civil standards of proof, and requires proof beyond a reasonable doubt, regardless of the "civil" label attached to the statute.

In re Winship, 397 U.S. 358 (1970), is instructive.  In Winship, the Supreme Court held that when a juvenile is "charged with an act which would constitute a crime if committed by an adult," that act must be proved beyond a reasonable doubt.  Id. at 359.  New York defined juvenile delinquents as persons older than seven but younger than 16 who "do[] any act which, if done by an adult, would constitute a crime."  Id. at 359, citing N.Y. Fam. Ct. Act § 712.  The Court rejected the argument that a lesser standard of proof was required because "delinquency status is not made a crime [and therefore] the proceedings are not criminal," id. at 365, concluding that "civil labels and good intentions do not themselves obviate the need for criminal due process safeguards" and that a "proceeding where the issue is whether the child will be found to be 'delinquent' and subject to the loss of his liberty for years is comparable in seriousness to a felony prosecution."  Id. at 365-66, citing In re Gault, 387 U.S. 1, 36 (1967) (internal quotation marks omitted).  The Court noted that though a different label was used, the individual was still subject to the "stigma of a finding that he violated a criminal law" and the "possibility of institutional confinement on proof insufficient to convict him were he an adult."  Id. at 367.

Although Winship establishes that a civil label is not always dispositive of the requisite standard of proof, the Supreme Court has made clear that a legislature's declaration of the civil nature of confinement may be overcome only where there is "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it civil.  Hendricks, 521 U.S. at 361, citing United States v. Ward, 448 U.S. 242, 248-49

(1980). Here, plaintiffs have met that high burden. The situation presented here is indistinguishable from that addressed in Winship. In neither case can the State use a particular label to obviate the need for appropriate procedural protections in determining whether an individual in fact committed acts that constitute a crime, where such a determination not only triggers the possibility of long-term detention, but also labels the person an "offender." Just as with a juvenile adjudication, the statute combines the severe deprivation of liberty attendant on detention and rehabilitative treatment with a stigmatic label. The statute subjects an Article 730 defendant found to have committed a sex offense both to the "stigma of a finding that he violated a criminal law" and to the "possibility of institutional confinement on proof insufficient to convict him were he an adult" competent to stand trial. Winship, 397 U.S. at 367. The consequences of the adjudication are significant. Article 730 defendants who are confined pursuant to the Act will be confined in secure treatment facilities, segregated alongside dangerous sexual criminals found to suffer from mental abnormalities. MHL §§ 10.06(k), 10.07(c). And the prerequisite for that confinement is a conclusion that they too have committed sexual offenses.

Article 10 is a civil statute, and provides civil, not criminal, remedies for individuals who are mentally ill and dangerous. Those remedies, however, are predicated on criminal conduct. The statute applies only to *criminals* or to individuals who would be criminals if they had been sane when they committed the acts which constituted the crime and had been competent to stand trial. The title of Article 10 is "*Sex Offenders* Requiring Civil Commitment or Supervision." (Emphasis added.) The statute refers to those subject to its provisions as "sex offenders" and "recidivist sex offenders." See, e.g., MHL §§ 10.01(a), (g). Individuals subject to the Act are

39

termed "sex offender[s] requiring civil management." MHL § 10.03(q). The instrument that the

Attorney General must file to instigate commitment proceedings is a "sex offender civil

management petition." MHL § 10.06(a). Both the terms "offender" and "recidivist" have clear

criminal implications. Black's defines an "offender" as "[a] person who has committed a crime,"

and a "recidivist" as "one who has been convicted of multiple criminal offenses, usually similar

in nature." Black's Law Dictionary (8th ed. 2004). The procedures involved as well as the

terminology used impart an aspect of moral condemnation, normally reserved for criminal

judgments, upon those found guilty at the Article 10 trial.[24]

Under the Mathews v. Eldridge standard, the severity of these consequences, normally

resulting only from criminal conviction, argues for the imposition of the highest burden of proof.

The second Eldridge factor, the risk of erroneous adjudication, points in the same direction, as

the risk is particularly high in the case of Article 730 defendants. The reason these defendants

have not been put on trial for the acts that form the basis of the criminal charges against them is

that they were found by a court to have been incompetent to participate in their own defense. To

have put them on trial on the criminal charge would have violated due process. Cooper, 517

---

[24] On these matters, the current statute stands in contrast to Kansas's sexual offender civil commitment statute upheld in Hendricks. 521 U.S. at 352. The Kansas statute applied to "sexually violent predator[s]," defined as those persons who "ha[ve] been convicted of or charged with a sexually violent offense and who suffer[] from a mental abnormality or personality disorder which makes [them] likely to engage in the predatory acts of sexual violance." Id. citing Kan. Stat. Ann. § 59-29a02(a) (1994). Though "predator" is not a gentle term, neither is it necessarily a criminal term. Furthermore, the Kansas statute applied not only to those who had been convicted of crimes, but also to those charged with committing crimes, and therefore did not purport to restrict itself to individuals who have committed criminal offenses. In any event, the Kansas statute only authorizes detention based on proof beyond a reasonable doubt that the individual was in fact a sexually violent predator. Hendricks, 521 U.S. at 352-53.

U.S. at 354 ("A defendant may not be put on trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him.'"), quoting Dusky v. United States, 362 U.S. 402, 402 (1960). Even at a criminal trial, with a standard of proof beyond a reasonable doubt and all the other attendant protections of the criminal process, the risk of an erroneous conviction is too great when the defendant lacks the ability to assist his attorney in defending the case.

Every other category of "offender" to whom the law applies has been found guilty of conduct constituting a crime beyond a reasonable doubt, at a criminal trial at which the defendant was fully able to participate in his defense. To *reduce* the burden of proving guilt for Article 730 defendants perversely heightens the risk of erroneous conviction. The unique circumstances of these defendants, who were adjudicated to have been unable to participate in their own defense, suggest a need for stronger, not reduced, procedural protections against erroneous conviction.

The standard of proof "represents an attempt to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." Winship, 397 U.S. at 370. A weakened standard of proof represents, by definition, the tolerance of a greater likelihood of error. When combined with the inherently greater risk of error implicated in trying a defendant who is unable to defend himself due to incompetence, the risk of erroneous adjudication of guilt becomes too great to permit the imposition of the stigma of the "sex offender" label and the attendant long-term deprivation of liberty.

41

The third Eldridge factor, the importance of the governmental interest at stake, does not suggest a more lenient standard of proof. Without question, the government interest involved here is of the highest order, involving the protection of the public safety against serious imposition. It is precisely that interest that permits the State, in effect, to put the incompetent on trial at all: given the importance of protecting potential victims against repeat sexual offenders, the difficulties that prevent a criminal trial of the incompetent cannot preclude the State from taking preventive steps to provide necessary treatment.[25] But the requirement of proof beyond a reasonable doubt that the respondent *is* an offender is not an obstacle to the statutory scheme. Indeed, a finding of criminal conduct beyond a reasonable doubt is prerequisite to "civil management" proceedings for every category of person subject to the scheme *other than* Article 730 defendants. There is no plausible reason to suggest that the governmental interest supporting Article 10 commitments would be undermined if the same requirement is imposed with respect to the category of defendants least able to defend themselves.

---

[25] Plaintiffs do not argue, and the Court does not hold, that individuals who were found either incompetent to stand trial or not guilty by virtue of insanity may not be detained pursuant to the Act because they have not been convicted of a crime. The statute is drafted to deal with individuals who are mentally ill, and it would be strange to prevent a state from dealing with mentally ill and dangerous individuals who have been adjudicated to have committed violent sexual acts via the civil remedies that this Act imposes. Even though Winship required certain procedural protections in the context of juvenile adjudications, it did not completely transform all aspects of the juvenile delinquency system into a criminal system. See, e.g., Winship, 397 U.S. at 359 n.1 (The opinion does not "rest[] . . . on the assumption that all juvenile proceedings are criminal prosecutions, hence subject to constitutional limitations . . . [W]e are not here concerned with . . . the pre-judicial stages of the juvenile process, nor do we direct our attention to post-adjudicative or dispositional process.") (citations and internal quotation marks omitted). So too here, requiring that New York must prove beyond a reasonable doubt that the Article 730 defendant committed the acts that constitute a crime that may have been sexual does not transform all aspects of Article 10, at least with respect to Article 730 defendants, into criminal proceedings.

Due process therefore requires that when an individual is subject to the stigma of being labeled a "sexual offender" and of a finding that he violated a criminal law triggering the possibility of institutional confinement, proof that he in fact committed the acts that form the basis for being labeled an "offender" must be made beyond a reasonable doubt.[26] Plaintiffs have demonstrated a likelihood of success in prevailing on their claim that the "clear and convincing" burden of proof does not afford the protections that due process requires in determining that Article 730 defendants are in fact "offenders" subject to the Act. Therefore, plaintiff's motion for a preliminary injunction will be granted with respect to this portion of the statute.

E.      MHL § 10.07(c)

The same constitutional difficulty that undermines § 10.07(d) affects § 10.07(c), albeit in a different way that presents a closer issue.

Eligibility for extended supervision under Article 10 is premised on the fact that an individual is not only an offender, but specifically a *sexual* offender. A sexual offender may be one who has committed either a crime that by definition includes a sexual element (for example, rape or sexual abuse) or a crime not necessarily sexual by definition (for example, kidnapping) in a sexual manner or with a sexual motive.[27] The Act thus recognizes that crimes that are not sexual in their essential nature may still constitute sexual offenses. New York's criminal code

---

[26] Plaintiffs do not argue that due process requires any other procedures to ensure that Article 730 defendants are dealt with fairly, and the Court expresses no view on any such issue.

[27] The provisions of Article 10 apply to individuals who have committed certain specialized crimes that are inherently sex-based offenses, such as rape and sexual abuse. MHL § 10.03(p); NYPL §§ 130.00-130.90. The provisions also apply to individuals who have committed certain "designated felon[ies]," MHL § 10.03(f), crimes not necessarily sexual in nature, in a way that demonstrates a "sexual[] motivat[ion]." MHL § 10.03(g)(4); NYPL § 130.91.

did not previously recognize such a category of "as-applied" sexual crimes, and the Act amends

the code to create a new crime: the commission of any one of a set of serious felonies "for the

purpose, in whole or substantial part, of his or her own direct sexual gratification."  NYPL §

130.91.  That crime will be, by definition, a sexual offense.  For those individuals subject to

Article 10 by reason of a crime committed after the enactment of Article 10, that crime must be

one of a defined set of sexual crimes, including a "sexually motivated felony" as defined by

NYPL § 130.91.  MHL § 10.03(p); NYPL §§ 130.00-130.91.  In such cases, the "sexual

motivation" will be an element of a crime that will have been charged, submitted to the jury, and

proved beyond a reasonable doubt in the underlying criminal case, before an offender will be

subject to the extended supervision provisions of the Act.

However, for those individuals sought to be detained based on a crime committed before

the enactment of Article 10, that crime need not have been proven before a criminal jury to have

been inherently sexual or committed with a sexual motivation.  The Act authorizes the detention

of such individuals if they have committed any one of a set of serious "designated felonies" with

a "sexual motivation."  For most of these individuals, it would have been impossible for the

sexual motivation determination to have been made at the underlying trial.[28]  Therefore, for those

---

[28] Some persons subject to Article 10 have been charged with, and convicted of, a
designated felony before Article 10 was enacted or proposed.  For such offenders, it would
obviously have been impossible to have put the "sexual motivation" issue to the jury at the
underlying criminal trial.  For an offender who committed his allegedly sexual crime before the
enactment of the Act, but who has been or will be charged with (and convicted of) his crime after
the enactment of the Act, New York could perhaps put the issue of "sexual motivation" before
the jury in the underlying criminal trial, so as to determine his eligibility for the detention
provisions of Article 10.  However, unlike those who committed their crimes after the Act's
enactment, those who committed their crimes before its enactment cannot be found guilty of, and
punished for, a crime that did not exist at the time that they committed the allegedly criminal
acts.  U.S. Const. art. 1, § 9. cl. 3.  Moreover, such a procedure could be at best unwieldy and at

who have committed the crime that forms the basis of their potential detention before the enactment of Article 10, the statute allows the "sexual motivation" determination to be made not at an underlying criminal trial, but at the civil commitment trial, at which the determination is to be made on the basis of clear and convincing evidence.  MHL §§ 10.03(g)(4), 10.03(p)(4), 10.07(d).

Plaintiffs contend the "sexual motivation" determination is in fact an element of a crime, and that due process therefore requires that it be proved beyond a reasonable doubt.  Defendants insist that due process requires only a "clear and convincing" standard of proof for civil commitment proceedings, relying on Addington for support.  441 U.S. at 432 (concluding that "the reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment").

Plaintiffs argue, however, that a retroactive determination that a pre-existing crime was committed with a sexual motive is essentially a criminal finding that necessitates a heightened standard of proof.  They point out that in Addington, the Supreme Court rested its acceptance of the lesser standard of proof on the inherent uncertainties of the diagnostic and predictive findings of "mental illness" and "future dangerousness," which are not the sort of historical facts for which the standard of proof beyond a reasonable doubt was designed.  The nature of a psychiatric diagnosis at issue in Addington raised a "serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be

---

worst prejudicial to defendants.  In any event, New York apparently has not attempted to provide a procedure for putting the issue before the underlying criminal jury in such cases.

dangerous" because the "subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." 441 U.S. at 429-30 (citations omitted). See also, Hollis v. Smith 571 F.2d 685, 692, 695 (2d Cir. 1978) (making determinations about a person's character and prospects for future conduct "beyond a reasonable doubt would either prevent the application of [commitment statutes predicated on such findings] except in the most extreme cases or invite hypocrisy on the part of judges or juries"); Id. (The "ultimate issue" is "not as in a criminal case whether an alleged act was committed or event occurred, but the much more subjective issue of the individual's mental and emotional character. Such a subjective judgment cannot ordinarily attain the same 'state of certitude' demanded in criminal cases."); United States v. Comstock, No. 5:06-HC-2195BR, ___ F. Supp. 2d ___, ___, 2007 WL 2588815 at *26 (E.D.N.C. Sep. 7, 2007).

In contrast, a determination of "sexual motivation," as Article 10 itself makes clear, is capable of being made by a jury beyond a reasonable doubt. "The state of a man's mind," as Lord Justice Bowen famously remarked, "is as much a fact as the state of his digestion." United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716-17 (1983), quoting Edgington v. Fitzmaurice, 29 Ch. Div. 459, 483 (1885). See also Arave v. Creech, 507 U.S. 463, 473 (1993) ("The law has long recognized that a defendant's state of mind is not a 'subjective' matter, but a fact to be inferred from the surrounding circumstances.") (citations omitted). Unlike the findings at issue in Addington that an individual is both mentally ill and dangerous, a determination that an individual committed a crime with a sexual motivation is a factual determination, normally based on inferences from the facts and circumstances, that can be made

beyond a reasonable doubt, as similar findings of purpose and intent are made every day in criminal trials.

Of course, the Supreme Court in Addington articulated other reasons besides the difficulty of making findings regarding mental illness and dangerousness beyond a reasonable doubt for holding the clear and convincing burden of proof standard acceptable for civil commitment proceedings. The most fundamental reason for the clear and convincing standard is that, unlike criminal commitment, "[i]n a civil commitment state power is not exercised in a punitive sense." Addington 441 U.S. at 428. Furthermore, the standard of proof beyond a reasonable doubt "historically has been reserved for criminal cases," and the calculation of interests relevant to civil commitment is different such that it "cannot be said . . . that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed." Id. at 428-29. Although Article 10, like the traditional civil commitment regime discussed in Addington, is intended to be therapeutic, protective, and regulatory rather than punitive, the sexual offender provisions of the Act differ crucially from other civil commitment regimes, in that they are reserved for persons who have already been brought into the criminal justice system, and either found guilty of sexual crimes, or determined in the commitment trial to have engaged in conduct constituting such crimes. A determination that one may need treatment is fundamentally different from a determination that one committed a crime, or that one is a sexual offender.

Applying the Mathews v. Eldridge standard to these offenders presents issues broadly similar to those discussed above in relation to Article 730 defendants, but with significant differences. First, with respect to the importance of the individual interests involved, the

47

ultimate stakes remain of the highest level, since the respondent's personal liberty is at risk in

these proceedings.  As noted above, however, in the discussion regarding MHL § 10.07(d), the

Constitution permits deprivation of liberty in the form of civil commitment on a showing of

mental illness and dangerousness by clear and convincing evidence, without any finding of

criminality at all.  Such findings are to be made in the course of the detention hearing

contemplated by Article 10 in any event.  What is at stake in the determination of whether a

respondent committed a crime with a sexual motivation is not whether such an offender can be

detained, but whether the respondent can be detained pursuant to this sexual offender regime.

    This, of course, is no small matter, not only because it is intertwined with the ultimate

detention decision, but also because there is, as noted above, a significant stigma associated with

the declaration that a person is a "sex offender."  In this regard, however, individuals covered by

MHL § 10.07(c) differ importantly from the Article 730 defendants covered by MHL § 10.07(d).

The persons covered by § 10.07(c) have already been found, beyond a reasonable doubt, to have

committed a serious felony, while the incompetent defendants covered by § 10.07(d), although

accused of crimes, have never been tried or found guilty, and continue to be presumed innocent

of any crime.  To designate the latter "sex offenders" requires that persons who have never been

convicted of a crime nevertheless be declared functionally guilty of serious felonies – which in

turn will subject them to a scheme of extended detention or other supervision not imposed on

any other person who has not been found beyond a reasonable doubt to have committed the

conduct constituting such a felony.  The defendants covered by MHL § 10.07(c), in contrast,

have already been formally condemned as felons based on proof beyond a reasonable doubt.

The further determination that their crimes had a sexual motivation is surely a serious matter that

must be weighed carefully in the Eldridge balance.  But the interest in question is not quite as strong as the interest of Article 730 defendants in avoiding a declaration of criminal guilt.

The risk that an offender will erroneously be found a sexual offender if the clear and convincing standard is applied is also less great for this group of respondents.  Unquestionably, the lessening of the burden of proof from "beyond a reasonable doubt" to "clear and convincing evidence" makes it easier for the finding to be made, and thus increases the chance of an erroneous finding of guilt (while, of course, reducing the risk that a respondent will erroneously be found *not* to have acted from a sexual motive).  But because defendants covered by MHL § 10.07(c) are competent to assist in their defense, they are far better able to make use of the assistance of counsel and the other procedural rights accruing to respondents at trial, to defend against erroneous accusations, and to raise doubts in the mind of jurors about the accuracy of the State's charges.

Moreover, the narrowness of the issue presented reduces the chance of erroneous condemnation.  Since the Article 730 defendants have never been found guilty of any crime, all of the elements of the underlying offense would be in play at an Article 10 trial.  The respondent would thus have the full panoply of criminal defenses, including mistaken identity, alibi, and challenges to the witnesses' or victim's version of events available.  Because of the respondent's incompetence, a lawyer representing the respondent would have little or no understanding of her client's version of the events, and thus would be enormously hampered in investigating the facts, selecting a defense, and challenging what may be a fundamentally mistaken understanding of the case.  In the case of a defendant who has been found guilty of a non-sexual serious felony, however, there is no chance of error about the perpetrator's identity, or about whether the basic

49

underlying crime was in fact committed: those facts have already been found by a jury beyond a reasonable doubt. In many cases, the sexual aspect of the case may be apparent, or, conversely, clearly absent. As compared with the cases covered by § 10.07(d), there will thus be fewer § 10.07(c) cases in which the burden of proof will likely make a difference, and in those, the respondent will be able to mount a defense. The extent to which the reduction of the burden of proof increases the risk of error is thus less in the case of § 10.07(c) than in the case of § 10.07(d).[29]

Finally, as is the case with the Article 730 defendants, while the interest of the State in the Article 10 scheme as a whole is extremely strong, the State's interest in the reduced burden of proof is more attenuated. For all sexual offenders who engage in criminal activity after the effective date of the Act, the sexual nature of their offense will have to be proven beyond a reasonable doubt, because such offenders will not be eligible for extended detention or treatment under Article 10 unless they are convicted beyond a reasonable doubt either of an offense that is sexual in its nature, or of the new crime created by the Act and codified at NYPL § 130.91. This makes it difficult for defendants to argue either that the retroactive finding of sexual motivation is not a finding of the element of a criminal offense, or that requiring such a finding to be make

---

[29] Plaintiffs argue that evidence that an individual has, at the present time, a sexual abnormality, another element at issue in the Article 10 trial, is "all but guaranteed" to taint the determination as to whether that individual has, in the past, committed crimes with a sexual motivation. (MHLS Mot. 9-10.) The argument has a certain air of unreality about it: it is far more likely that the evidence that the crime of conviction had a sexual aspect is what triggered the inquiry into the defendant's mental abnormality in the first place. In any event, as in all trials, the jurors will be properly instructed about the different issues they will be required to decide, the relevance or irrelevance of different pieces of evidence to each of those issues, and the need to follow any necessary limiting instructions, and it will be presumed that the jurors will follow those instructions.

beyond a reasonable doubt will cripple, or even hamper, accomplishment of the State's salutary

purposes in enacting Article 10.

Defendants argue that the State could constitutionally justify civil detention based on a

finding by clear and convincing evidence, at the underlying criminal trial, that the individual

committed the crime with a sexual motivation, and that the Legislature did not provide for such a

lesser standard at the underlying criminal trial simply in order to avoid confusing the jury with

multiple standards of proof.[30]  That argument is unpersuasive.

First, the commission of the new crime – "sexually motivated felony" – also triggers a

sentencing scheme, NYPL § 70.80, requiring certain mandatory minimum sentences that differ

from the mandatory minimum sentences applicable to the commission of the underlying felonies

without a sexual motivation.[31]  It is thus not clear that New York could constitutionally reduce

---

[30] Counsel for defendants contended at oral argument that the State required a heightened standard of proof for the "sexual motivation element" at the underlying criminal trial not as a constitutional necessity, but as a matter of legislative "genero[sity]."  (See Tr. 40 ("I think what the legislature wanted to do was avoid confusing the juries or other triers of fact about what standard of proof they are supposed to employ.  I mean, it was generous to those individuals who were charged after, but it makes sense in light of that.").)

[31] Pursuant to NYPL § 70.80(4)(a), a person who has committed a felony sex offence as criminalized by NYPL § 130.91 is subject to certain mandatory minimums to which they would not otherwise be subject.  See NYPL §§ 70.80, 130.92(3).  Whereas the standard mandatory minimum for those who have committed a class B through class E felony is one year, NYPL §§ 70.00(2), 70.00(3), for those who committed a class B felony with a sexual motivation, the minimum term of imprisonment is five years, NYPL § 70.80(4)(a)(i), for those who committed a class C felony with a sexual motivation, the minimum term of imprisonment is three and a half years and the maximum term of imprisonment is 15 years, NYPL § 70.80(4)(a)(ii), for those who committed a class D felony with a sexual motivation, the minimum term of imprisonment is two years, NYPL § 70.80(4)(a)(iii), and for those who committed a class E felony with a sexual motivation, the minimum term of imprisonment is one and a half years,  NYPL § 70.80(4)(a)(iv). Even higher mandatory minimums apply if the individual who committed the sexually motivated felony is a "predicate felony sex offender" as defined by NYPL § 70.80(c).  See NYPL §§ 70.80(4), (5).

the burden of proving this element at the underlying criminal trial.[32]

Second, the prospective statutory scheme makes even clearer that the function of the "sexual motivation" element is not to decide who is in need of extended treatment, but to define a category of *convicted criminals* who are then eligible for *assessment* for such treatment. The function of the finding of sexual motivation is to define the kind of crime that the offender committed, not to determine whether he requires treatment. The clear and convincing standard of proof applies under Addington to factual assessments relating to the latter question, not the former. Thus, contrary to the State's argument, when the criminal jury under Article 10's prospective scheme is assessing the offender's motivation, it is not making an assessment of his need for extended treatment beyond expiration of his criminal sentence. That is a decision that will be made at a later date and by another jury – possibly many years later – based on a finding of mental abnormality and dangerousness as of that time. The Article 10 jury's finding about the nature of the offense is a retrospective, historical finding about the nature of the offender's conduct that triggers such an assessment, not an aspect of the assessment itself.

---

[32] A heightened mandatory minimum sentence with no corresponding increase in the maximum sentence may not offend the Supreme Court's recent jurisprudence holding that subjecting a defendant to enhanced sentencing based on an additional offense element requires a jury finding of that element beyond a reasonable doubt. See Harris v. United States, 536 U.S. 545, 557 (2002) (finding that facts affecting mandatory minimums need not be proved beyond a reasonable doubt); McMillan v. Pennsylvania, 477 U.S. 79, 91 (1986) (same); cf. Apprendi v. New Jersey, 530 U.S. 466 (2000); Blakely v. Washington, 542 U.S. 296 (2004); United States v. Booker, 543 U.S. 220 (2005). It is not clear, however, that a majority of the Supreme Court continues to accept the validity of Harris and McMillan. See, e.g., Harris, 536 U.S. at 569 (Breyer, J., concurring in part and concurring in the judgment) ("I cannot easily distinguish Apprendi . . . from this case in terms of logic."); id. at 572 (Thomas, J., joined by Stevens, Souter, and Ginsburg, JJ., dissenting) ("McMillan . . . conflicts with the Court's later decision in Apprendi."). However, NYPL § 130.91 is nonetheless a different crime from the commission of the underlying felony without a sexual motivation, and a crime for which the consequences are potentially more severe for a portion of those convicted.

Finally, even accepting arguendo defendants' premise that the State could have provided prospectively for a trial finding of sexual motivation by clear and convincing evidence (for example, by foregoing any sentencing consequences other than eligibility for civil commitment under Article 10), the fact is that it did not. The issue in this case is not the constitutionality of hypothetical statutes that the Legislature might have passed affecting future sexual offenders. Rather, the inquiry under Mathews v. Eldridge is whether the procedural protections provided by the actual legislation with respect to past offenders are adequate, given a balancing of factors including the strength of the governmental interest in the existing scheme. Thus, regardless of the reasons why New York elected to require proof beyond a reasonable doubt of sexual motivation on a prospective basis, the fact that it did – and that it says it did so in order to simplify trial procedure by avoiding multiple standards of proof – undermines any claim that requiring proof beyond a reasonable doubt will interfere with the accomplishment of the statute's purposes.[33]

The balancing standard of Mathews v. Eldridge necessarily involves the Court in weighing factors that the Legislature presumably considered in enacting the statute. Caution is therefore appropriate in evaluating the statutory scheme, and deference to the Legislature's conclusions is appropriate to the judicial role. Moreover, precedent is sparse and conflicting.

---

[33] Alternatively, counsel argues that the reduced standard of proof was necessary because the gap in time between the crime committed with the alleged sexual motivation and the commitment hearing makes proving the "sexual motivation" element "quite a burden," and thus provides adequate justification for easing the State's burden of proof. (Tr. 40.) But the burden of defending oneself against such a charge also becomes more difficult with time. Thus, to the extent that the difficulty of accurately determining the offender's motivation retrospectively is a factor in the decision, that suggests an increased risk of error (a factor arguing for stronger procedural protections) as much as it suggests greater difficulty in accomplishing the State's purposes.

The case of juvenile delinquency adjudications addressed in Winship appears to be the only case in which the Supreme Court has mandated proof beyond a reasonable doubt in proceedings denominated civil, and Addington's holding that those found to be dangerous and mentally ill by clear and convincing evidence may be civilly committed stands as a counter-example supporting the State's conclusion. The case of persons already found guilty beyond a reasonable doubt of a serious felony is less clearly analogous to Winship, moreover, than that of the mentally incompetent Article 730 defendants, who have never been found guilty of any crime and whose ability to defend themselves is by definition seriously impaired. Thus, while the prospective statutory scheme appears to demonstrate that the State could accomplish its goals with respect to past offenders even if a higher burden of proof were imposed, the other factors in the Eldridge balance do not point as strongly in favor of enhanced procedural protection.

Arguably, the case of offenders convicted of serious but non-sexual felonies gravitates closer to Addington. A state may civilly commit an individual based on clear and convincing evidence that he or she is mentally ill and dangerous. It therefore appears somewhat anomalous to hold that a state may not civilly commit or subject to an extended treatment regime an individual who has already been convicted of a serious crime based on clear and convincing evidence that he is mentally abnormal and dangerous, along with the additional finding that his previous crime was committed with a sexual motivation. Unquestionably, in the civil proceeding contemplated by Article 10, evidence that the respondent's past criminal acts were committed with a sexual motivation would be admissible in any event to prove the existence of a mental abnormality or a present danger to others such that an individual merits detention. Rather than subject all criminal defendants to screening for possible proceedings under Article 10, New York

has chosen to limit eligibility for extended detention to those whose crimes involved a sexual motivation. It is hardly clear that, in the absence of explicit guidance to the contrary, this Court should prevent a state from focusing on those types of individuals who, in the State's judgment, most likely require commitment.

With respect to these defendants, therefore, the question of constitutionality is more closely balanced than with respect to the Article 730 defendants discussed above. On the current record, plaintiffs have not demonstrated a likelihood of success on the merits, and therefore their motion for a preliminary injunction will be denied. It is also not clear, however, on the face of the complaint, that Winship or Addington forecloses relief. A fuller record with respect to the types of cases that are subject to MHL § 10.07(c) may well affect the proper understanding of the Eldridge factors. At this stage of the case, the parties are unable to address how many offenders are subject to § 10.07(c), the length of time typically separating a criminal conviction from proceedings under Article 10, or the nature of the evidence that may be available to retrospectively assess the motivations of offenders, among other factors that may bear on the balancing of the Eldridge factors. Whether retrospective re-characterization of a crime in a civil proceeding requires the same procedural protections as are required for classifying an incompetent defendant as a criminal is an issue sufficiently complicated, with sufficiently broad ramifications, that the Court cannot simply find the statute constitutional on a motion to dismiss based solely on the pleadings. Accordingly, defendants' motion to dismiss that portion of the complaint that refers to MHL § 10.07(c) will also be denied.[34]

---

[34] Plaintiffs' equal protection argument adds nothing to the analysis. Essentially, plaintiffs argue that it is irrational to distinguish the standard of proof applicable to prospective offenders from that applicable to past offenders. However, the two categories of offenders are

F.      MHL § 10.05(e)

Article 10 provides for a right to legal counsel, with the appointment of counsel at state expense for those who cannot afford it, upon the Attorney General's initiation of a formal action against a respondent.  MHL § 10.06(c).  Therefore, a respondent is guaranteed state-funded counsel for all judicial hearings pursuant to the Act.  Plaintiffs contend, however, that counsel is also required before the Attorney General files any formal action before a court, when an individual who is being investigated by a CRT is asked to submit to a psychiatric exam.  This psychiatric exam may affect both the CRT's recommendation to the Attorney General and the Attorney General's case for confinement at the probable cause hearing and commitment trial.

Article 10 provides for three potential psychiatric examinations before the commitment trial.  First, during the investigational stage, before institution of any judicial proceeding, the CRT may request that an offender submit to a psychiatric examination in connection with the CRT's investigation to determine "whether the respondent is a sex offender in need of civil management."  MHL § 10.05(e).  While the offender apparently may decline to participate in the interview, such a declination may be used against him.  At the commitment trial, the jury "may

---

distinct, and present distinct problems.  Going forward, New York has decided that the proper way to address the problem of sexually-motivated felons is to create a new category of crime, something that the State plainly is constitutionally forbidden from doing retrospectively by the Ex Post Facto Clause of the Constitution.  U.S. Const. art. 1, § 9. cl. 3.  But New York does have an interest in addressing the potential present and future need for extended treatment or detention of individuals whose crimes were committed in the past.  The choice to deal with future offenders primarily through the creation of a new criminal prohibition does not foreclose New York from dealing otherwise with past offenders who are presently mentally abnormal and dangerous. The question is whether the procedures adopted to deal with such past offenders are consistent with due process in their own right.  Any difference between those procedures and the procedures put in place with respect to future offenders is thus a rational product of the different situations of past and future offenders, and not of any irrational bias against or greater hostility toward past as opposed to future sex offenders.

hear evidence of the degree to which the respondent cooperated with the psychiatric examination" and, upon request and if it so finds, the court can "instruct the jury" that "respondent refused to submit to a psychiatric examination." MHL § 10.07(c). If the CRT finds that the respondent is such a sex offender, it must notify both the respondent and the Attorney General in writing. MHL § 10.05(g). This notification must include a written report from a psychiatric examiner that includes a finding as to whether the individual has a mental abnormality. Id. This determination necessarily occurs in advance of the filing of a civil management petition, and triggers the formal court process, including the probable cause hearing and the commitment hearing. MHL §§ 10.06(a); 10.06(g); 10.07(a). An individual is not entitled to counsel when asked by the CRT to submit to a psychiatric evaluation, MHL § 10.08(g), and the statute provides no notice to the respondent of the potential consequences of the examination.[35]

Second, upon receipt of the CRT report (but still before the filing of a sex offender civil management petition), the Attorney General may petition the court to order the respondent to

---

[35] As was clarified at oral argument:

> The Court: "Now, what kind of advice of rights, if any, does [a respondent asked to participate in a CRT-requested psychiatric examination] get . . . When an individual gets told, we would like you to see Dr. So-and-so in connection with this process . . . Then the doctor shows up. What is this person supposed to do? How is he supposed to make a decision as to do I go through [with] this, what does this mean, what are my rights? He is basically on his own to make that call?"
> Counsel for Defendants: "I think he is pretty much on his own to make that call."

(Tr. 76-77.)

submit to an evaluation by a psychiatric examiner.  MHL § 10.06(d).  If the court grants relief,

the interview will be conducted by a psychiatric examiner of the Attorney General's choosing.

Id.  An individual is entitled to counsel upon the Attorney General's filing of such a petition.

MHL § 10.06(c).

Third, after the filing of a sex offender civil management petition but prior to the

commitment trial, the individual against whom the petition was filed may ask the court to order

that he be evaluated by a psychiatric examiner of his own choosing.  MHL § 10.06(e).  If so

ordered, and if the respondent cannot afford to pay a psychiatric examiner, the court "shall

appoint an examiner of the respondent's choice to be paid within the limits prescribed by law."

Id.  Following the examination, the examiner shall report his findings in writing to the

respondent or his counsel, the Attorney General, and the court.  Id.  If unable to afford one, a

respondent is entitled to counsel upon the filing of a civil management petition, MHL § 10.06(c),

and therefore will have the assistance of counsel in petitioning the court for a respondent-

requested psychiatric exam.

The Second Circuit has suggested that involuntary commitment proceedings trigger a

right to counsel.  Project Release, 722 F.2d at 976.  However, it has also declined to extend that

guarantee to pre-hearing psychiatric interviews held pursuant to the civil commitment provisions

of Article 9 of New York's Mental Hygiene Law.  Id. ("[W]e [are not] prepared to require that

legal counsel be guaranteed at pre-hearing psychiatric interviews" under Article 9.); cf. Ughetto

v. Acrish, 518 N.Y.S.2d 398, 405 (1987) (holding that the New York legislature intended that

"in the absence of any showing that counsel's presence would interfere with the psychiatric

examination, counsel should be permitted to observe either directly or indirectly these [Article 9]

prehearing psychiatric examinations").  In evaluating Article 9 of the Mental Hygiene Law, the Second Circuit found it constitutionally sufficient that commitment procedures specifically provided a right to counsel, at state expense, in all judicial proceedings.  Project Release, 722 F.2d at 976.  Article 10, like Article 9, provides a right to counsel, at state expense, in all judicial proceedings.

Plaintiffs contend that the interests implicated here are different from those at issue in Project Release.  They note that the civil commitment as a mentally abnormal sex offender under Article 10 engenders greater stigma than a psychiatric commitment under Article 9.  Furthermore, individuals are presumptively committed to a "secure treatment facility" under Article 10 in contrast to a non-secure hospital under Article 9.  Also, Article 10 requires a court order for release of a detained individual, and does not permit release based solely on the clinical judgment of his treating doctors.  Article 9 allows release based on the clinical judgment of the treating physicians without a court order.  Plaintiffs argue that these greater intrusions on the detainees' liberty warrant greater protections against the erroneous deprivation.  Plaintiffs also argue that not only is the CRT-prompted psychiatric interview functionally mandatory, but operates as a critical stage of the commitment hearing,[36] which, especially in view of the diminished capacity of many individuals subject to the provisions, merits the appointment of counsel.  Plaintiffs do not contend that counsel should be permitted to intervene in the examination.  Rather, they argue only that due process requires a passive observational role for

---

[36] See, e.g., MHL § 10.08(g) (relevant written reports of psychiatric examiners are admissible in any hearing or trial pursuant to Article 10); MHL § 10.07(c) (jury may hear evidence of the "degree to which the respondent cooperated with the psychiatric examination" and if the respondent "refused to submit to a psychiatric examination").

counsel in the CRT psychiatric hearing only so as to ensure that the psychiatric report and testimony based on the interview is accurate.  (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 4.)

Though there are differences between the two civil commitment provisions, it is unlikely that these differences are sufficiently significant to require a different constitutional mandate. First, and as a general proposition, the Second Circuit, like courts in other jurisdictions, has been reluctant to extend the right to counsel to psychiatric examinations.  See, e.g., Project Release, 722 F.2d at 976; Hollis v. Smith, 571 F.2d 685, 692 (2d Cir. 1978); United States v. Baird, 414 F.2d 700, 711 (2d Cir. 1969); see also Tippett v. Maryland, 436 F.2d 1153, 1158 (4th Cir. 1971); United States ex rel. Wax v. Pate, 409 F.2d 498 (7th Cir. 1969); United States v. Albright, 388 F.2d 719, 726-27 (4th Cir. 1968); State v. Whitlaw, 45 N.J. 3, 210 A.2d 763 (1965).  Second, the specific statute at issue here provides that any one against whom a civil management petition has been filed has the option, with the assistance of appointed counsel if he cannot afford his own, to petition the Court for his own examiner, also paid for by the State, to examine the individual and potentially rebut any distortions or inaccuracies in the report or testimony of the CRT-prompted or Attorney General-petitioned psychiatric examiner.  MHL § 10.06(e).  Practically speaking, the most effective counter to an improperly-conducted psychiatric examination is not the presence of counsel, but a more professional examination by another psychiatrist.  Based on both the statutory structure as well as the presence of cases from this Circuit suggesting otherwise, plaintiffs are unable to demonstrate a likelihood of success on the merits with respect to this constitutional claim.  The chances of succeeding on this point appear slim, and therefore their motion for a preliminary injunction will be denied.

It does not follow, however, that defendants' motion to dismiss must be granted.  First, because plaintiffs seek relief different from that sought in Project Release[37] and because of the differences between the consequences of Article 9 and Article 10 proceedings set forth above, it cannot be said that Project Release absolutely forecloses the position advanced by plaintiffs.  Second, the evaluation of plaintiffs' arguments requires a more detailed understanding of how the psychiatric examination provisions of Article 9 and Article 10 operate.  Plaintiffs argue, for example, that these proceedings function as a critical stage in the proceeding, and the strength of such an argument depends on factual allegations whose accuracy cannot be assessed on a motion to dismiss.[38]  Plaintiffs are entitled to develop their record, and it will be more appropriate to

---

[37] Plaintiffs here seek only an observational role for counsel, and not a participatory role.  (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 3 n.2.)  In Project Release, the plaintiffs contended that individuals had a statutory "right to have [someone] present as counsel at discussions between [themselves] and hospital staff."  722 F.2d at 969, citing Project Release v. Prevost, 551 F.Supp. 1298, 1303 n.2 (S.D.N.Y. 1982).  The Second Circuit "found no error in this determination."  722 F.2d at 969.  It is not clear from either the opinion of the district court or the Second Circuit the exact role that plaintiffs sought for the counsel at such discussions, though being present "as counsel" normally implies an active role.  It is precisely because an active counsel may interfere in the course of a hospital discussion or psychiatric examination that courts are often reluctant to grant such a right to counsel.  See, e.g., Hollis, 571 F.2d at 692 ("'It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that.'"), quoting Tippett, 436 F.2d at 1158.

[38] Plaintiff MHLS filed suit before the effective date of the Act, and "did not fully appreciate, until seeing SOMTA in operation, how critical the psychiatric exams under MHL 10.05(e) would prove" to the position of individuals subject to the Act.  (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 2.)  Plaintiffs claim that "[i]n practice, nearly all psychiatric exams so far conducted under Article 10 have been arranged by the case review team, rather than the attorney general, and accordingly, counsel has not been involved."  (Id.)  Upon the filing of an Article 10 petition, the psychiatric examiner who conducted the CRT evaluation "is ordinarily called as the State's primary or sole witness at the probable cause hearing" and that the State "may even enter the examiner's report without calling the examiner to testify."  (Id.)  Plaintiffs also note that in addition to the fact that the individuals being

61

adjudicate the merits of this argument on summary judgment or at trial. Therefore, both plaintiffs' motion for preliminary injunctive relief and defendants' motion to dismiss the complaint will be denied.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is granted with respect to the challenged portion of MHL §§ 10.06(k) and 10.07(d), and denied in all other respects, and defendants' motion to dismiss is granted with respect to plaintiffs' challenge to MHL § 10.0(j)(iii), and denied in all other respects.

Plaintiffs are directed to submit a proposed form of order consistent with this opinion after consultation with defendants.

SO ORDERED.

Dated: New York, New York
       November 16, 2007

GERARD E. LYNCH
United States District Judge

---

interviewed may be of impaired capacity, there exists an "emotional tension" inherent in a psychiatric interview that may determine the interviewee's eligibility for post-sentence civil commitment. They liken this to the context of criminal line-ups. (Id. at 3 n.2, citing United States v. Wade, 388 U.S. 218, 230-31 (1967) (discussing how "emotional tension" may interfere with a suspect's ability to accurately observe and report on line-up procedures).)

62